STATE OF NORTH CAROLINA v. STEPHEN LOUIS MOORE

No. 352A85

(Filed 2 June 1987)

**Criminal Law § 15.1— pretrial publicity—motion for change of venue—standard of proof**

   The trial court applied an incorrect standard of proof in ruling against defendant on his motion for a change of venue or for a special venire in a first

degree murder case because of pretrial publicity when the court concluded that defendant had the burden to prove that the pretrial publicity had been so extensive and inflammatory that it would be "virtually impossible or at least highly unlikely" that an impartial jury could be drawn from the county rather than requiring defendant to establish a "reasonable likelihood" that he would not receive a fair trial in the county.

APPEAL by the defendant from judgment entered by *Wood, J.,* at the February 1985 Criminal Session of Superior Court, RUTHERFORD County.

The defendant was indicted for first degree murder. His case was tried as a capital case. A jury found him guilty as charged and recommended a life sentence, which was imposed. The defendant appealed to this Court as a matter of right. Heard in the Supreme Court on 11 February 1987.

*Lacy H. Thornburg, Attorney General, by Dennis P. Myers, Assistant Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Geoffrey C. Mangum, Assistant Appellate Defender, for the defendant appellant.*

MITCHELL, Justice.

The defendant contends, *inter alia,* that the trial court erred in denying his motion for a change of venue or for a special venire. N.C.G.S. §§ 15A-957 and 958 (1983). He argues that the trial court applied an incorrect standard of proof to the evidence he introduced in support of his motion. We agree and hold that the defendant is entitled to a new trial.

A complete review of the evidence is not necessary for an understanding of the legal issues involved in this case. Briefly, evidence for the State tended to show that the defendant and the victim dated and lived together for a time. The defendant is black, the victim white.

A motion for change of venue, or for a venire from another county, is addressed to the sound discretion of the trial court. *State v. Oliver,* 302 N.C. 28, 274 S.E. 2d 183 (1981). Such a motion may be based *inter alia* on grounds of prominence of the victim or inflammatory pretrial publicity. *See State v. Harrill,* 289 N.C. 186, 221 S.E. 2d 325, *death sentence vacated,* 428 U.S. 904, 49 L.Ed. 2d

1211 (1976). "Publicity" includes publication by word-of-mouth. *State v. Boykin*, 291 N.C. 264, 229 S.E. 2d 914 (1976).

At the hearing on his motion, the defendant offered substantial affirmative evidence tending to show that, at the time of his trial, (1) prospective jurors in his case were reasonably likely to base their verdict upon conclusions induced by outside influences, rather than evidence introduced at trial, and (2) as a result, there was a reasonable likelihood that he would not receive a fair trial in Rutherford County. *See State v. McDougald*, 38 N.C. App. 244, 248 S.E. 2d 72 (1978), *appeal dismissed*, 296 N.C. 413, 251 S.E. 2d 472 (1979). His evidence, if believed, demonstrated extensive inflammatory media coverage of this case, pervasive discussion of it throughout the county, and the social prominence of the victim and her family within Rutherford County.

The defendant submitted affidavits of fifty-three citizens of Rutherford County that the case against the defendant had been discussed throughout their communities, and people had formed opinions concerning the case. The affiants believed that the defendant could not receive a fair trial in Rutherford County at that time. The defendant also presented the live testimony of one witness to the same effect.

The defendant tendered newspaper accounts of the case, which recounted that the defendant was "a former prison inmate." Rutherford County Sheriff Damon Huskey was quoted as having said the defendant harassed the victim, broke into her house, and was dangerous. Sheriff Huskey "believed Moore was waiting for [the victim] outside her home, then followed her inside." The newspaper accounts stated that the defendant was serving a five-year sentence for a 1977 assault on a police officer in Watauga County, although he had been originally charged with kidnapping. The prosecutor in Watauga County was quoted as saying of the 1977 incident, "It was an armed camp . . . . We could have had a shootout of mammouth [sic] proportions. He finally surrendered . . . . The crimes we prosecuted him for were very violent crimes, usually with a gun." The defendant was identified as having been paroled in 1979, but later convicted of discharging a firearm into an occupied motor vehicle and assault on a police officer. The head of the FBI in North Carolina was

quoted as saying the defendant is "extremely dangerous" and a "Dr. Jeckyll [sic] and Mr. Hyde type."

Front-page headlines in the Forest City *Daily Courier* included, "Lawmen wait for a break: In search for killer of ICC instructor" and "Moore put on most wanted list." The defendant also tendered the affidavit of the publisher of the *Daily Courier* that it has a daily circulation of 9,092 within Rutherford County. The trial court found that Rutherford County has a population of 55,000.

The prosecutor called eleven witnesses at the hearing on the defendant's motion. Each of these witnesses opined that the defendant could receive a fair trial in Rutherford County. Upon cross-examination, however, each corroborated the defendant's showing of extensive pre-trial media and word-of-mouth discussion of the case.

The first witness for the State, for example, testified that there had been little discussion of the case in his community. On cross-examination, however, he admitted hearing the case discussed among his church members based upon newspaper accounts and people saying, "I hope they catch him." Additionally, his wife had mentioned to him that the FBI described the defendant as "extremely dangerous" and a "Dr. Jeckyll [sic] and Mr. Hyde type."

Another witness knew the defendant was an ex-felon and recalled Sheriff Huskey describing him as "dangerous." The witness had read that the defendant was on the FBI's most wanted list, heard people say they hoped law enforcement caught him, and heard "all the time" from "everybody" that they disapproved of interracial dating.

One witness had read several newspaper accounts of the case. He had read that the defendant was an ex-felon, that he was placed on the most wanted list, that the FBI said the defendant was "extremely dangerous" and a "Dr. Jeckyll [sic] and Mr. Hyde type." He thought he could have read that Sheriff Huskey described the defendant as "dangerous." He had heard the defendant and the victim were living together. At the least, people were aware that the defendant and the victim dated. He had heard people expressing disapproval about black-white dating.

A resident of Rutherfordton had seen the defendant on television news a time or two. He had read newspaper accounts of the defendant's capture. He knew the defendant was an ex-felon.

Another witness for the State said that he was aware of the case "by the talk that was going on and being in the paper and so on." He knew the defendant and the victim had been living together because "[i]t was fairly common knowledge." District Attorney Alan C. Leonard, demonstrating commendable candor, recognized that the case had been "discussed quite a bit" among county residents, "No question about that." He also recognized that some people probably had made up their minds and that the newspaper accounts were "more than what they should be."

Ten prospective jurors had either read or heard about the case from others. One said that the newspapers were "full of it." One prospective juror said he had "heard a lot about this case." Two of his children were students at the school where the victim taught when the murder occurred. He was excused for cause. Each of twenty-seven prospective jurors said that they did not approve of interracial dating; only two said they felt it was up to the individual. Thirteen of the prospective jurors examined knew Sheriff Huskey. They all were excused. One prospective juror worked with the victim's father, one was a friend of her family, and the wife of another was a friend of the family. These people also were excused.

The defendant exhausted his peremptory challenges. *See State v. Dobbins*, 306 N.C. 342, 293 S.E. 2d 162 (1982). Of the twelve jurors eventually selected, all stated their disapproval of interracial dating except one who said it was an individual question. Six jurors knew at least one of the State's witnesses, including one juror who was acquainted with the victim's sister and her secretary. Ten of the twelve jurors selected knew Sheriff Huskey. He was, for example, a good customer in one juror's store and a distant cousin of another juror's mother.

Having reviewed the evidence introduced, the trial court concluded as a matter of law that:

[T]he defendant has the burden of proof from a preponderance of the evidence to demonstrate that pretrial publicity has been so extensive and inflammatory that it would be *vir-*

*tually impossible or at least highly unlikely* that a fair and impartial jury could be seated in this case drawn from a venire of Rutherford County jurors.

(Emphasis added.) This placed an unduly high burden of proof upon the defendant. In *State v. Jerrett*, 309 N.C. 239, 307 S.E. 2d 339 (1983), we stated:

[T]he test for determining whether venue should be changed . . . is whether, due to pretrial publicity, there is a *reasonable likelihood* that the defendant will not receive a fair trial. Stated otherwise, a defendant's motion for a change of venue should be granted when he establishes that it is *reasonably likely* that prospective jurors would base their decision in the case upon pretrial information rather than the evidence presented at trial and would be unable to remove from their minds any preconceived impressions they might have formed.

309 N.C. at 254-55, 307 S.E. 2d at 347 (citations omitted) (emphasis added).

The trial court inadvertently applied an incorrect standard of proof in ruling against the defendant on his motion for a change of venue or for a special venire. The defendant was entitled to a consideration of the evidence offered in support of his motion under the correct standard. We are unable to ascertain with certainty what the trial court's ruling would have been had the proper standard been applied. In light of the totality of circumstances indicated by the evidence, failure to apply the correct standard when ruling on the defendant's motion was error requiring a new trial of this case.

If the defendant believes that any unfair prejudice resulting from publicity exists in Rutherford County at the time of his new trial, he will be free to present evidence and arguments in support of any new motion he may make for a change of venue or for a special venire. At that time, the trial court will have the opportunity to consider any evidence which may be introduced and to apply the correct standard before ruling on any such motion.

New trial.